Senators 2014, 32, 62, Ziyaya Mtola v. United States Senator and Appreciate 15 Mr. Prasad and Wendy Overmeyer. Good morning. May it please the Court, I'm Wendy Overmeyer for the Federal Public Defender for Ziyaya Mtola and I'd like five minutes for rebuttal. Not all acts of defiance to authority are criminal acts and to ensure this distinction all circuits require the use of force in regard to misdemeanor assault under 111A. Mtola is guilty of failure to depart the United States, but he's not guilty of misdemeanor assault. What if he kicked one of the officers when it happened? Would that change anything? That would change. That would change things. That would be physical contact, first of all, and then it would also be physical force that he used. The jury here found him not guilty of physical contact and the videos do not show him kicking the officers in the deportation effort in April. It's the use of force that is the critical distinction between crimes and disobedience and it limits the statute to threatening forcible behavior. There doesn't have to be actual force use, there can be the threats of force use, but even that did not occur in this case. There was no pushing, no profanity, no verbal threats made by Mtola. He didn't strike the officers, he didn't have a weapon, he didn't use a makeshift weapon or anything of that nature. Did it take six people to get him where he was going? He passively resisted by going limp and he had to be physically, once he was handcuffed, several officers took him to the grounds that you can see on the video, it's not clear why he was taken to the ground, but they took him to the ground, put shackles and handcuffs on him and he went limp during that effort and he had to be physically carried both to the transport van and then from the transport van to, they decided to place him in a restraint chair and apparently it took about eight to ten officers to place him in that restraint chair. But during the effort, he was not using force against the officers in any way. The videos show that the force being used was by the officers in this case and they were the ones initiating the contact and initiating the force and he passively resisted. Some of their testimonies are not consistent with that. I think it seems to me the key premise of your argument is that the juries have to render consistent verdicts and I don't think that's true. What happens here is the district court, there was some confusion on the district court's part as to the element of force. And it's clear from EMTOLA's Rule 29 motion when that was denied, the district court said there's enough evidence to show forcibly assault and knowing resistance, interference or impediment. Well the element of force doesn't just apply to assault. The element of force applies to resistance or obstruction or interference. And it's clear there was no assault here and the jury found that there was no actual assault here but it can be, the crime can be committed in other ways through resistance or interference but there still has to be the element of force and the district court seemed to be confused as to whether force applied equally to all of the acts. How would you forcibly resist? What conduct would you say satisfies that requirement since resistance entails something different from aggressiveness? Right, well to forcibly resist, there are several cases where people have been found guilty of misdemeanor assault with the use of force with some people have spit at officers or yelled threats at officers while they're resisting so they haven't actually assaulted the officers or anything but they've resisted arrest saying, yelling obscenities while they're being arrested, while they're letting their hands be handcuffed or maybe putting their hands down. They're also threatening the officers in some way verbally would be I guess one way that you could do it with force but in this case it's clear from the videos that he was not using force and again the charges are only to officers. Wait, how clear do you think the videos are? What's that? How clear do you think the videos are? Well there are three videos. Right, right. But I mean you have officer testimony and it seems to me the videos don't capture everything. They don't capture everything, they're from certain vantage points. That leaves you with the officer testimony. It does. I think the jury here did discredit a lot of the officer's testimony. I don't understand how you, this is the part of your argument I'm just not getting because every time you say that, you're saying that based on the one acquittal, the acquittal, right? Right. But this goes back to inconsistent verdicts. This just happens all the time. I mean inconsistent verdicts benefit defendants far more than they hurt them because they allow for nullification, they allow for all kinds of things and I think that's fundamentally what's going on here. It's our argument that the jury didn't understand and the district court didn't understand that force was a separate element that had to be found. Are you challenging the jury instructions? We're challenging the jury instructions in the context of a sufficiency argument and that the district court didn't understand. But I mean it's one or the other. I mean you say there wasn't sufficient evidence under the instructions given to the jury. That's option A. Or option B is who cares? What they did doesn't matter because they got the wrong instruction about this offense. So that's B. Which one are you? Our argument is a sufficiency argument. So A. It's a sufficiency argument. So the instructions were fine? It's similar. We didn't object to the instructions. I think the instructions maybe could have been more clear but the elements were there. You didn't provide any alternative? No. Not at trial. No. It's similar to the argument in Gagnon which this case decided and in that case they challenged sufficiency of the evidence of the same statute and challenging the elements of it. There it went to whether assault had to be an element and here we're talking about force. But again it was the elements, making sure the elements were there within the sufficiency argument. They didn't challenge the jury instructions in that case either. So we're back to the core question of what did Gagnon or however you pronounce that case, what is it to forcibly perform a prohibited action? Correct. And force is defined in, they didn't define force in Gagnon but earlier this court has defined force in Kimes and it's a threat or display of physical aggression as to inspire fear of pain, bodily harm or death. And that's agreed on across the circuits. Different circuits disagree about other aspects of the statute but not that. Didn't one of the officers say that he was kicked? Yes. And if the jury believed that, isn't that a forcible assault? Yes. It would be. Well it would have also been physical contact. Back to the inconsistent verdict point. Right. So the jury found him guilty of misdemeanor assault with no physical contact. Do you have a case for the proposition that there's a physical contact charge, acquitted of that, because this is it seems to me what you need to win this case. A case that says having been acquitted of that, that means all evidence of physical contact potentially going to other criminal charges can't be considered in the sufficiency equation. Because if you have that case, that is really powerful. If you don't have that case, you're stuck with the kicking testimony and the normal rules for sufficiency. I don't have a case. I have cases where people have been found guilty of misdemeanor assault but the appellate court for resistance, but the appellate court has found it to be passive resistance and that they should not have been convicted. Because I mean one reason inconsistent verdicts are fine and good and tolerable and why they often, they can help as much as hurt defendants, is just think about it the other direction. The other direction is they convicted on the forcibly, the only real evidence of that is the kicking, so the physical contact thing must be wrong, right? I mean you can just switch the whole thing around and we know we're not allowed to do that. Oh, I understand. And that's a good thing. That would be a good thing. I understand the court's viewpoint and I'll rest the argument on the brief. I did want to briefly talk about, and I see my time is up, just the sentencing very quickly, that the district court doubled the guidelines here, sua sponte, upward variance, and that was based on alleged false testimony of EMTOLA. But the court did not make the proper, any findings as to false testimony that are required when you apply the enhancement, 3C1.1. The court here varied up based on false testimony, but did not make any findings. And it's not really made clear from case law, but we're asking that when courts vary upward for false testimony, that they be required to make the same findings as when they apply a obstruction of justice enhancement for false testimony. Because without those findings, such a variance intrudes on a defendant's right to testify. What's the best support for that point? Dunnigan, a Supreme Court case from 93. And did it involve this situation? That is, it was an obstruction of justice enhancement. Enhancement. No, but your point is to extend. What's your best case for extending that rule here? I don't have a case for that. It's the principle, this court recently discussed Dunnigan and Roman Oliver that was decided this year. And again, that was in the context of an enhancement. And so I think the danger here is to affirm a sentence where the court varied up based on false test, alleged false testimony, but the court did not make any findings. It lets courts possibly get around the Dunnigan requirements that you make these three findings of false testimony by simply just imposing a variance instead of an enhancement. Was that objection made at that time? Yes, it was made at that time and then again after sentencing. Quote Dunnigan on that? I don't know that Dunnigan was brought up to the district court, but an objection was made to the variance and the alleged false testimony. Objecting to the variance is one thing, but laying out this theory, I think, is what Judge Seiler's asking. I don't have the words right in front of me of what the objection said to the actual sentence. But they did, at trial, or I mean, I'm sorry, at sentencing, they did preserve the objection to both. I'm sorry, to the substantive unreasonableness of the variance, excuse me. And that was, there are many reasons given by the district court for the variance, and that was one. But under Vonner, it's the substantive reasonableness objection is the one you don't have to worry about, i.e., it's too high a sentence. The one you have to preserve is the procedural reasonableness one. So was that, and I think that's what Judge Seiler's asking was. Okay, well, we conceded in our reply brief that we did not make a procedural objection at sentencing. So a procedural error would have to be reviewed for a plain error. Why isn't this a procedural error? because the point you're making is a process one. It's not that you can't have double the guideline sentence. Your point is, if you're going to do this, you're kind of end running the requirements for obstruction of justice. So we want fact findings. That seems like a process thing. In fact, it seems like eminently the reason for objections, because then, of course, is the time when the fact finding can be done. We can't do the fact finding. Well, the court here, again, did not make any factual findings correct, and this court has- No, but did you object, did you say to the district court, you're end running the requirement that's already there for obstruction of justice. Please make fact findings. That was not placed, that was not said at sentencing. So don't we have to do plain errors to that point? We argue in our brief that even under plain error standard, this meets the requirements. Because not to find, not to make the three findings for false testimony intrudes on the right to testify. And it will have a chilling effect on defendants who are going to testify if the court can simply vary upward without making findings as to false testimony. Those findings that it's false, it's material, it's willful. And so that is a manifest injustice to allow that to stand, that exception to stand. Okay, well, you'll get your full rebuttal. So thanks for answering our questions, and we'll hear from the government. Good morning, Your Honors. May it please the court, my name is Dan Hurley, and I represent the United States. I'll start with a sensing issue, unless the court would like to hear otherwise. I disagree factually, and I disagree legally. I don't think the judge granted the variance based on the false testimony. If you look at what the judge says in his statement of reasons, the reason that the judge varied upward by 18 months was because he thought this defendant, over the course of essentially a month, repeatedly said, I'm not going back, you can't make me. I will do whatever it takes to thwart this process. That's what the judge talked about when he said, this is why I need to vary. I need to give a message to this defendant. I need to make sure he understands that there is serious consequences to this. I need to make sure he's going to go back compliantly when they do try to remove him after the serving of the sentence. I don't think the judge at any point said, I'm varying because I think he lied. The judge talked about what he considered the lie in the context of saying, this is someone who knew he was supposed to go back. When the defendant said at trial, I thought I had something in the works. I didn't understand the process. That's why I had the lawyer. I didn't know what was going on. The judge said, I think that's a lie. And that's relevant to the willfulness of this defendant's conduct in thwarting his removal. There's nothing in this record that says the judge said I'm granting an upward variance based on false testimony. Even if the court had done that, Gaul makes clear, variances and departures are different things. Departures are under the guidelines. This court made clear in every case since Gaul, or actually since Booker, you need to make guidelines determinations. The district judge needs to calculate the sentence using the book of the guidelines. And then the court applies 353A factors. And the court is free in that 3553A process to think about different factors or the same factors. And decide sentence within the guidelines, sentence at the bottom of the range, top of the range, middle of the range, below the range, above the range. That's what this court did. There's nothing in the law that says it can't do that. But in fact, the statute requires the district court to do exactly what it did here. Did the court consider the lack of remorse or something of that nature? It did, but in the context of, is this defendant going to go willingly next time? And there's nothing wrong with that. That's a factor the court has to consider deterrence under the statute. It also has to consider the need for a just punishment. And that factor, that issue, whether the defendant has seen the error of his ways and will behave differently when he is removed after a sentence is perfectly appropriate for the district court to consider, and that's what the court did. The court even asked defense counsel, is he going to behave differently next time? But didn't the- What was the response? The answer was, I can't speak to that, your honor. And then when the defendant had a chance to allocute, he declined to make a statement. I don't think the district court held it against the defendant. But in deciding how much punishment is enough to make sure this defendant and others like him go back, because we can't have our removal process held hostage by defendants who say, I'm not going, you can't make me. I'm sorry? I'm just struggling with the sufficient but not greater than necessary nature of the punishment. You requested, or the government requested 18 months. That's correct, your honor. Express concern that, about willingness to leave and impose supervised release, which ought to take care of that issue. I'm struggling with why a double, doubling of the 18 months that you requested is not greater than necessary in light of your request and in light of the supervised release that ought to provide the assurance of leaving. There's two responses to that. First of all, your honor, there is no mathematical formula. And although it's a doubling, it's an 18 month increase. Yeah, well, but a doubling is a doubling. I know that 20 years to 40 years is a whole lot more time. But if there is a guideline provision that is to govern your punishment, then doubling it is the same whether you're doubling a small amount or a larger amount. I understand that, your honor, but the Supreme Court has made clear that we give district courts exactly that discretion. And if they cut it in half, if the court gave a six month sentence half the bottom of the range,  it is not presumed to be reasonable, but it is not presumed to be unreasonable. And I think lurking behind the court's question is some suggestion that, should we presume this to be unreasonable because it's a doubling? And this court and the Supreme Court's made clear, there's no such presumption. There's no inherent unreasonableness. Well, I agree, I'm not presuming that doubling does. I'm trying to look to the factors that were considered in choosing to double. And there's been a lot of discussion about lack of remorse and willingness to leave. And what I'm asking you is, in balancing those factors, doesn't the supervised release provision also address that issue? It touches upon it, but it doesn't fully address that issue. It also requires another round of proceeding. And so that's another round of, we'll try again, how many rounds do we get? And the district court is required to then go through another, how many rounds does this defendant get? The district court also did not speak only about forward looking. It also talks about a just punishment, because the statute requires a just punishment. It also requires that the deterrence be not simply to this defendant, but to all persons who are faced with removal, are given the message, essentially, you have to be compliant. There are regulations, there are statutes that say you must be compliant. And a just punishment, this district court, in its discretion, thought 18 months is not a serious enough punishment to send that message to deter other people. You might think a guideline range is appropriate. Other judges might think below the guideline range is appropriate. I'm not saying that 36 months is the only sentence. All I'm saying is, the Supreme Court's made clear district courts- The district court have had discretion in this very case to cut the guidelines recommendation in half to go from 18 to nine? Could have done absolutely that. And that would be affirmable, because it's within the discretion. District court could have gone at least close to zero and said I'm going to impose the maximum term of supervised release to speak to that issue. I'm not saying that would be the right result. I'm saying we give district courts a lot of discretion, and converting these factors and ideas to numbers is not only imprecise, it's not. These aren't numbers, but the district court is told it has to come up with a number. Isn't there a problem with releasing somebody after they've served time and put them on supervised release anyway? Well, I don't think there's any question this defendant was never going to actually be under supervision, but he was going to be subject- He'd just get removed at the end of his- That's right, and so the one year term of supervised release was essentially an insurance policy that if he doesn't cooperate at that point, then the government can bring another prosecution for hindering his removal. They can do a somewhat streamlined process, up to one year for the violation of supervised release. Those are always options for the district court, but that doesn't mean that the district court can't also consider, I need to send a message, I need to impose a serious punishment. And this particular district judge thought for this defendant, 18 months wasn't enough, and part of that- On the first issue, this criminal statute, so you have this word forcibly, then you have the word assaults. So how do you, what does forcibly mean? Assaults would pick up forcibly, is there just some redundancy here that is unavoidable, or what's your take on how to make sense of this? Well, I think the particular question in this case was decided by this court in Gagnon, and I don't think there's any room, there's any wiggle room that in Gagnon, the defendant resisted. The court talks about how he was drunk. There were no punches thrown, there was no aggressive conduct, but this court affirmed his conviction against this very challenge. The reason there were no jury instructions in Gagnon, and there was a reference to this earlier, it was a bench trial. It was tried to the magistrate judge, and so there were no jury instruction issues to worry about. And that's also how, what started as a challenge to the sufficiency of the evidence, became an opinion about the statutory construction. Okay, so just what's the answer to the question I asked? The answer is, I think the statute really ought to be written, assaults or forcibly resists, forcibly impedes, forcibly interferes, etc. Should be written or interpreted that way. It should be read that way. I think forcible is inherent in assault in the sense that there's some sort of physical aggression. Whether the blows land or not, there's some sort of physical aggression. I think Congress was trying to allow passive resistance. If there's a sit down strike at a military base, I think Congress allowed for that, and that's not a crime. But if you instead wrap your arms around the legs of people trying to get into the military base, now you are using force to impede them. If you are doing it to federal officers, you're impeding them. My difficulty with counsel's argument is that the references keep coming back to assault. But this court's made clear this statute can be violated by resistance, by impeding, by interfering, by obstructing. And I don't think it requires offensive behavior, but there's no question. There was a use of force by this defendant. He did not go passive. Counsel suggested that he just went limp. He was limp as he was carried out to the van. He was not limp. If you look at the video about six minutes in on government's exhibit nine, officers Pinson and Roberts are behind him. Roberts is the one with the hat. Pinson is the one with the north face jacket. You can see the white lettering on the back shoulder. And they're trying to put his hands in handcuffs. Someone who's limp, you just pull the one hand and you pull the other hand. They couldn't do that. His hands are moving, his arms are moving. The whole pile moves from one side of the desk to the other side of the desk. Comes back, then they all go down, and then it still takes a substantial period of time to get his hands under control. We can't see it because there's bodies in the way, but there's no way you can watch that video and he's using force, moving, exercising his muscles. He's resisting in some way, and he's resisting in a forcible way. Then if you look at government's exhibit ten, the video involving the van out in the Sallyport area. There's two points, about a minute 15 in, and then about four minutes, four minutes 15 seconds. You can't see the inside of the van, but the officers testified, and you can see in the video, the defendant's in the van, and he is clearly trying to come out of the van. This is at 1.15, and then again at about 4.20. And you can see the officers rush back, and both Pinson and Roberts, who were the two identified victims of this forcible resistance, they're right there. And the testimony was, he's lunging, he's physically trying to get out of the van, he was kicking his feet, he was thrashing around. That's forcible resistance. It may not be an assault, because he may not have been thinking, I'm trying to inflict punishment. But he's moving his body in a physical way, trying to impede them. He's trying to interfere with what they're doing. That's the essence of what this statute is designed to outlaw. That's what this court in Gagnon said, is a misdemeanor violation of the statute. We think the evidence is clear, based on the testimony of the officers. The video supports what the officers said, in terms of both on the floor, at the desk, and on the floor getting the cuffs on in the van. This is forcible resistance, and that's sufficient under the statute. Unless the court has any other questions, I'm prepared to rest in a brief. I don't think so. Thank you very much. Thank you, Your Honor. Appreciate it, Mr. Hurley. Ms. Overmyer. How do you respond to the discretionary right of the court to have chosen supervised release, and in addition, a longer term? A sentencing court does have discretion to impose a sentence that it feels is justified, but it must make proper findings on the record. So, an appellate court can review that decision, and that sentencing decision is not without review. Even under the abuse of discretion standard, there is a level of review there. And this court in Payton recently reviewed a sentence that was double the guidelines, and noted that such sentences are particularly harsh, and require sufficient justification for that variance. Are they just as bad as one that's half the guidelines? I didn't hear the first part, I'm sorry. Are sentences that double the guidelines range just as bad or potentially outside the range of discretion as sentences that are half the guidelines range? It does go both ways, and this court has said that. Both of them are abuse of discretion, or presumptively abuses of discretion. How would you put the point? I wouldn't say they're presumptively an abuse of discretion. I just think they require sufficient findings made on the record that justify the sentence. Whether the court goes very low, which this court has reviewed cases where they give a day when the guidelines are very high. That's to one extreme, and then the other extreme is sentences that double or triple the guidelines upward. It both requires- I thought the whole point was to not be obsessed with the guidelines. I thought that was the whole point. The idea was, is this too long? That's the point. Is 36 months too long in light of the 355-3A factors? And I just feel like the doubling, halving tells you just about nothing. What really matters, unless we're going to decide to go back to the pre-Booker world. But I think, and the reason this is so hard to win in either direction, is the 355-3A factors include an awful lot of considerations. They do. Any factor can be considered a sentencing, essentially. But those factors have to be valid, and those factors can intrude on constitutional rights, such as the right to testify or the right to deny guilt of the charges. And the court here didn't have a policy disagreement with the guidelines, and the court didn't impose its variance for general deterrence. It imposed it specifically because it thought EMTOLA was a very great risk of not doing this in the future. Well, wasn't there an implication in the judge's discussion that deterrence for the community at large is an issue in removal cases? I don't recall offhand if that was included in his variance statement. I know he primarily focused on the deterrence to Mr. EMTOLA in particular. He was very concerned that he would resist deportation again in a way. But Mr. EMTOLA, the factors of this deportation were a very isolated set of factors. And it was out of character for Mr. EMTOLA. And he was confused as to the information he was getting from his immigration attorney, which was different than what he was getting from the immigration agents. And whether that happens in the future remains to be seen. Whether he's actually deported in the future remains to be seen. There's an immigration appeal pending. The immigration policies have recently changed as of November 20. His lawyer told him over the phone? I'm sorry? Do we know what his lawyer told him over the phone? EMTOLA testified, he did not speak to his attorney at the second deportation effort. The first one, he talked to his attorney who told him that the motion remained pending. And that he hadn't heard from the clerk. And that EMTOLA would hear from him when the case was over. And he tried to explain this to the officers at the second deportation effort. And he was not allowed to speak with his attorney. They claimed that they called the attorney on a speakerphone when EMTOLA was in the van, upset. But he didn't actually speak with his attorney at that time. And they didn't say what the attorney had said on the phone at that time. And if I can, that just reminds me of the first argument. As to force, he mentioned Mr. EMTOLA's activities in the van. And that exercising muscles is enough to qualify as force. That's a very broad definition of force. And that's much broader than any circuit has defined force. Force is defined as an immediate threat of bodily harm, pain, death, or display of physical aggression. And Davis, the second circuit, had a case where the defendant tensed up his arms to resist being handcuffed, and they found that was not enough. That was not enough to qualify as force, to simply tense one's muscles to resist handcuffing for misdemeanor assault. And so, Mr. EMTOLA asks this court to vacate the convictions for count three and four. And to vacate his sentence as substantively unreasonable. Okay, thank you very much, Ms. Overmyer, and thank you, Mr. Hurley, to both of you for your helpful oral arguments and briefs. We appreciate it. The case will be submitted, and the clerk may call the next case.